# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL DANIEL CROYLE, by and | ) | |
| Through SANDRA G. CROYLE, as his | ) | |
| Parent and legal guardian, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO.  4:16CV1853 HEA |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion to Dismiss, [Doc. No. 9].  Defendant moves to dismiss Plaintiff's Complaint for lack of subject matter jurisdiction and failure to state a claim on which relief can be granted under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), respectively. Plaintiff opposes the Motion.  For the reasons set forth below, the Motion will be granted.

### Facts and Background

Plaintiff's Complaint alleges:

Reverend Mark Matson ("Reverend Matson") was a Catholic priest who was a member of the Theatines religious order. Reverend Matson graduated from Seminary in 1972 and was ordained as a Catholic priest in 1976.

In 1997 through 1998, Reverend Matson served as a priest and Confraternity of Christian Doctrine ("C.C.D.") religious teacher at Tripler Army Medical Center in Hawaii ("Tripler"). His services were procured by way of a contract that Tripler signed with the Theatine Fathers in Honolulu, Hawaii.

Tripler is the headquarters of the Pacific Regional Medical Command of the United States armed forces and was commissioned and is administered by the United States Army ("Army").

Upon information and belief, the Army and/or Tripler had the right to control the details of the day-to-day performance of the duties of Reverend Matson and/or supervised the day-to-day operations of Reverend Matson and/or exercised day-to-day control over the activities of Reverend Matson. Upon information and belief, this control and/or supervision included, but was not limited to, the following:

(a) The Army and/or Tripler would determine for all patients at admission their religion and would daily provide the names of those patients to Reverend Matson, to whom Reverend Matson would provide religious service;

(b) Based on the above providing of names, Reverend Matson would make daily or regular visits to those patients offering religious service;

(c) The Army and/or Tripler provided Reverend Matson an office area;

(d) The Army and/or Tripler provided Reverend Matson support staff at the Tripler facility;

(e) The Army and/or Tripler provided Reverend Matson with a military assistant who coordinated his activities and his providing of religious service;

(f) Reverend Matson was designated by the Army and/or Tripler to be the administrator in charge of the C.C.D. classes at Tripler which included supervision over the C.C.D. teachers, most of whom were volunteers from the base;

(g) The Army and/or Tripler would procure and schedule, as needed, the attendance and religious services of Reverend Matson for military ceremonies and festivities, including the providing of prayers and benedictions at such;

(h) Reverend Matson performed daily mass at Tripler upon the request of and/or scheduled by the Army and/or Tripler;

(i) Reverend Matson provided religious service and support at other military chapels on the base and to other military personnel around the base as requested and as needed by the Army and/or Tripler;

(j) Reverend Matson regularly reported to the Army and/or Tripler his activities;

(k) The Army and/or Tripler evaluated the performance of Reverend Matson; and

(l) The Army and/or Tripler had and exercised the ability to terminate the services of Reverend Matson.

In about 1996 through about 1999, MICHAEL's father was a physician in the United States Army and was stationed at Tripler. Michael, along with his parents and sister lived off base the first year and then on base afterwards.

While stationed there, Michael and his family attended church services in the chapel at Tripler. Reverend Matson led the services there with great pomp and circumstance, always surrounded by children.

At the end of Sunday services, Michael and the other children would leave their parents in the chapel to attend C.C.D. classes in the nearby rooms. After C.C.D. classes, the children would return to their parents in the chapel.

Between about August 1997 through Spring 1998, when Michael was approximately 8 years old, Reverend Matson would escort Michael out of the chapel for C.C.D. classes, but instead of taking him for classes, Reverend Matson diverted him to a room and sexually assaulted Michael. Michael remembers being sexually assaulted by Reverend Matson at least 6 times.

As to the first sexual assault at Tripler, while still in the chapel, Reverend Matson asked Michael if he wanted to see a magic trick. He then took Michael to a room and had him sit down. Reverend Matson put Michael's head on his thigh and Michael saw Reverend Matson's penis causing his robe to rise. Reverend Matson

performed oral sex on Michael. While doing so, Reverend Matson masturbated himself. He also spanked Michael's buttocks.

The second time Reverend Matson sexually assaulted Michael at Tripler, he again performed oral sex on Michael while masturbating himself and spanked Michael's buttocks.

The third time Reverend Matson sexually assaulted Michael at Tripler, he took Michael to a room and had Michael pull down his pants. Reverend Matson put his hands on Michael's waist and performed anal sex on Michael. This caused Michael great pain. Reverend Matson ejaculated on Michael's back. During the third sexual assault, Reverend Matson told Michael that he would go to hell if Michael told anyone what had occurred. This warning reverberated in Michael's head as he heard Reverend Matson's voice during Sunday services. Reverend Matson also confused Michael by telling him what they were doing was normal. Michael had a continuing obsession with the idea that he was evil and was going to hell because of what he was doing with Reverend Matson.

Other sexual assaults of Michael at Tripler also included Reverend Matson forcing Michael to touch Reverend Matson's penis and perform oral sex on Reverend Matson.

Reverend Matson's sexual abuse of Michael caused Michael to be sexualized and obsessed with sex since the abuse, which included Michael surfing internet porn and seeking out sexual encounters with strangers.

Reverend Matson also told Michael that his parents knew about the sexual acts he was committing upon Michael and that they approved of them and had arranged for them to take place. This caused Michael to greatly resent his parents over the years as well as causing him to act violently towards them.

Michael has suffered from mental injuries/conditions since the sexual abuse and it is believed that these conditions were caused and/or exacerbated by the sexual abuse.

On October 19, 2007, Michael was adjudged an incapacitated and disabled person, and his mother, Sandra, was appointed as his guardian and conservator of his estate.

After the sexual abuse by Reverend Matson, Michael failed to have any present memory of the abuse until 2012.  In 2012, Michael first disclosed to Sandra that he had been sexually abused by Reverend Matson.  Neither Michael nor Sandra discovered the connection between the sexual abuse and his injuries until 2012.  Neither Michael nor Sandra discovered or had reason to know of the negligence of the Defendant, described below, until 2012.

Prior to his service at Tripler, Reverend Matson sexually abused several minors he met through his duties as a priest in the same or similar manner that he abused Michael. For example, from 1976 through 1977 Reverend Matson sexually abused a 15-year-old male seminary student while he was the rector at a seminary in Glendale, Colorado, wherein Reverend Matson would perform oral sex on the boy while masturbating himself. In 1983, at a church in Englewood, Colorado, a 13-year-old boy asked to use the phone at his sister's wedding and met Reverend Matson, who locked the door to the office, fondled the boy, and, in subsequent incidents, continued doing so for several months. Reverend Matson was arrested for fondling two teenage boys in 1987 in Colorado wherein he gave the boys a ride and shared a bottle of whisky with them, and talked to them about a relaxation technique he called "floating." While showing them the technique, he would touch their genitalia. In 1989, Reverend Matson was also accused of sexually assaulting a youth in Santa Rosa, California resulting in a public trial.

Very soon after the period of time Reverend Matson sexually abused Michael, he was terminated from his position at Tripler on June 2, 1998, reportedly due to an act of petit theft.

Only a few months afterwards, in August of 1998, Reverend Matson sexually assaulted a 13-year-old boy in Hawaii in a park, at which time he fondled the boy and attempted to perform oral sex on him. Reverend Matson was trying to

show the boy some magic tricks, including how to levitate, when the sexual contact occurred. In 2000, a jury in Hawaii convicted Reverend Matson of the charges of third-degree sexual assault and first-degree attempted assault and he was incarcerated for 20 years.

Upon information and belief, during the time period Michael was sexually abused, the UNITED STATES knew or should have known that Reverend Matson had sexually abused minors and also had a sexual proclivity for boys. Plaintiff was unaware that the Defendant's hiring and/or procuring of the services of Reverend Matson, permitting of Reverend Matson to come into contact with Michael in the trusted position of a priest, and failure to take any action against Reverend Matson, proximately caused Michael's childhood sexual abuse by Reverend Matson.

Upon information and belief, after learning that minors were sexually abused by Reverend Matson, Defendant failed to disclose, and acted and conspired to conceal, withhold and affirmatively misrepresent, information about the abuse and Reverend Matson's dangerous sexual propensities with minors, to the Plaintiff, Plaintiff's parents, and others, in order to protect Reverend Matson, conceal Defendant's own wrongdoing in hiring and/or procuring of services and supervising Reverend Matson, and prevent Michael and other victims of Reverend Matson from filing civil lawsuits. When Reverend Matson was terminated from his position as priest at Tripler, the Army made misrepresentations as to the true

reason for this action against Reverend Matson. The Army also failed to advise the Plaintiff or Plaintiff's parents of Reverend Matson's subsequent sexual assaults of minors in Hawaii.

Based on this failure to disclose, concealment, withholding and affirmative misrepresentations, concerning the abuse and Reverend Matson's dangerous sexual acts and propensities with minors, and Michael's lack of present memory regarding his own abuse, Michael failed to receive timely psychiatric and psychological treatment. The treatment that Michael underwent was ineffective or less effective than it could have been had his treatment providers been made aware of his past abuse by Reverend Matson or had reason to inquire of Michael about such.

Count I of Plaintiff's Complaint alleges negligence against the United States pursuant to the Federal Tort Claims Act 20 U.S.C. §2671 et seq. ("FTCA"). Plaintiff alleges:

Reverend Matson, as a priest providing spiritual leadership, guidance and education, was in a special position of trust and confidence with Plaintiff, his family and other military families at Tripler, and owed them a fiduciary or special duty.

By placing Reverend Matson in a trusted position of priest for them, the Defendant was in a special position of trust and confidence with Reverend Matson and with Plaintiff, his family and other military families at Tripler, and owed them

a fiduciary or special duty of care. As a priest, Plaintiff, his family, and other military families at Tripler looked to Reverend Matson for counseling and guidance. As a priest, families entrusted their children to his care when they allowed them, at the end of services, to leave with Reverend Matson ostensibly to attend C.C.D. classes.

The Defendant, by virtue of its relationship with Reverend Matson, occupied a special or fiduciary relationship to Plaintiff.  Plaintiff and his parents placed his trust and confidence in the Defendant's institutions and representatives. Plaintiff and his parents looked to the Defendant and its representatives for counseling and guidance. In addition, the Defendant knew that Plaintiff had a special and privileged relationship with Reverend Matson.

By placing Reverend Matson in a trusted position of religious teacher for Michael and the children of other military families, the Defendant was in a relationship with Michael of school-student, such that it owed a duty to protect him from foreseeable harms on school premises and during school related activities. In this regard the Defendant was *in loco parentis* with the C.C.D. students at Defendant's Tripler facility, including Michael. In promoting Tripler's religious school services to parents, the Defendant undertook to provide a healthy, nurturing and safe environment for children.

At all material times, the Defendant owed a duty to use reasonable care to protect the safety, care, well-being and health of the minor Michael while he was under the care, custody or in the presence of Reverend Matson. These duties encompassed the protection and supervision of Michael, and otherwise providing a safe environment for Michael while on Defendant's premises. These duties also included a duty to warn Michael's parents of relevant information in their possession or control that their son was in danger or had been exposed to danger.

The Defendant was in a special relationship with Reverend Matson of employer and employee/agent such that it had a duty to take steps to make sure that he was safe before giving him access to students, children, and all military families seeking religious services, including Michael and his family.

Defendant owed Michael a fiduciary or special duty:

(a) In hiring and/or procuring the services of Reverend Matson, to sufficiently investigate his background in order to discover the existence of past misconduct, particularly sexual misconduct to minors, including while within his role of priest;

(b) In hiring and/or procuring the services of Reverend Matson, retaining and supervising Reverend Matson, to prevent foreseeable harm to religious service participants and religious students and prevent clergy and/or educator sexual misconduct;

(c) To investigate and warn Michael and/or his parents of the potential for harm from Reverend Matson;

(d) To notify Michael and/or his parents of allegations that Reverend Matson had sexually abused other minors, including abuse it learned of that occurred soon after the time period when Reverend Matson was employed by and/or providing religious services at Tripler;

(e) To disclose its awareness of facts regarding Reverend Matson that created a likely potential for harm;

(f) To disclose its negligence with regard to hiring and/or procuring the services of, supervision and retention of Reverend Matson;

(g) To provide a safe environment for Michael where he would be free from abuse; and

(h) To protect Michael from exposure to harmful individuals like Reverend Matson.

Defendant breached its fiduciary or special duty to Michael by failing:

(a) In hiring and/or procuring the services of Reverend Matson, to sufficiently investigate his background in order to discover the existence of past misconduct, particularly sexual misconduct to minors, including while within his role of priest;

(b) In hiring and/or procuring the services of Reverend Matson, retaining and supervising Reverend Matson, to prevent foreseeable harm to religious service participants and religious students and prevent clergy and/or educator sexual misconduct;

(c) To investigate and warn Michael and/or his parents of the potential for harm from Reverend Matson;

(d) To notify Michael and/or his parents of allegations that Reverend Matson had sexually abused other minors, including abuse it learned of that occurred soon after the time period when Reverend Matson was employed by and/or providing religious services at Tripler;

(e) To disclose its awareness of facts regarding Reverend Matson that created a likely potential for harm;

(f) To disclose its negligence with regard to hiring and/or procuring the services of, supervision and retention of Reverend Matson;

(g) To provide a safe environment for Michael where he would be free from abuse; and

(h) To protect Michael from exposure to harmful individuals like Reverend Matson.

Count II is brought under the theory of negligent supervision/premises liability against Defendant pursuant to the FTCA, 20 U.S.C. §2671 et seq.

Plaintiff claims that the Defendant owed a duty to Michael to use reasonable care to ensure the safety, care, well-being and health of Michael while in the care and custody of the Defendant and the Defendant's agents, representatives, and

employees. The Defendant's duties encompassed using reasonable care in the retention and/or supervision of Reverend Matson and to provide a safe environment at hospitals, chapels and other places for religious worship, rooms provided for religious education, and other locations and premises within its control at Tripler.

Further, as Michael was an invitee to the premises at Tripler within the control of the Defendant, the Defendant had a non-delegable duty to maintain the premises in a reasonably safe condition, including providing Michael a safe environment where he would be free from sexual assault by persons with access to Tripler and/or the military base, or whom the Defendant had the right to control. This duty of care also arises from the fact that Reverend Matson was employed by the Defendant and/or providing religious services for the Defendant, by providing religious services to military personnel and their families, and at a location and premises under its control.

At all relevant times, as Tripler was a secured military facility, Defendant had the ability and authority to control access to the base and hospital and exclude from access to its premises anyone who presented a danger to others on the premises, in particular, military personnel and their families, including Michael and his family.

At all relevant times, Defendant had authority to terminate Reverend Matson from his duties, prevent his contact with children on the premises within its control at Tripler, or exclude him from said premises.

Neither Michael nor his parents knew or could have known that Michael might be sexually assaulted by persons authorized to be at Tripler or on the military base and/or working or providing services thereon.

The Defendant owed Michael a duty to warn him of all known dangers, as well as those dangers that the Defendant should have become aware of through the exercise of due care. These dangers included Reverend Matson's propensity to sexually abuse minors.

The Defendant breached these duties by failing to exercise reasonable care to protect the minor Michael from sexual assault committed by Reverend Matson, who was working or providing services at Tripler and/or on the base under the authority of Defendant and on premises within its control.

At all relevant times, the Defendant knew or in the exercise of reasonable care should have known that Reverend Matson was unfit, dangerous, and a threat to the health, safety and welfare of minors entrusted to his counsel, care and protection.   Despite such actual or constructive knowledge, Defendant allowed Reverend Matson to be on locations and premises within its control and provided

Reverend Matson with unfettered access to Michael and gave him unlimited and uncontrolled privacy with the minor.

In discharging its duty of care to Michael arising from the above-described special relationships, Defendant could have implemented policies, procedures and training to protect Michael, including among other things, having a chaperone or third person with the Plaintiff at all times that he was in the presence of Reverend Matson. In breach of its duties to Michael, Defendant failed to implement any such policies, procedures or training that were necessary to protect Michael from foreseeable harm while he was attending religious services or seeking religious education on Defendant's premises.

As a direct and proximate result of the negligent or wrongful acts or omissions of Defendant, Plaintiff has suffered severe psychological, emotional and physical injuries, and emotional distress arising out of the physical injuries, pain and suffering, mental anguish, inconvenience, loss of capacity for the enjoyment of life, inability to lead a normal life, shame, humiliation and regression, and lost wages and costs associated with medical/psychological care and treatment.

Alternatively, as direct and proximate result of the negligent or wrongful acts or omissions of Defendant, Plaintiff sustained an aggravation of an existing disease or mental or physical defect or activation of a latent condition and the same losses associated with such.

Alternatively, as direct and proximate result of the negligent or wrongful acts or omissions of Defendant to timely disclose it knowledge of the dangerousness of Reverend Matson discovered soon after the Plaintiff's abuse, and the resulting failure of Plaintiff to timely receive appropriate treatment therefore, Plaintiff sustained the aforementioned injuries.

## Motion to Dismiss Standard

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may be either a "facial" challenge based on the face of the pleadings, or a "factual" challenge, in which the court considers matters outside the pleadings. *See Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993); *Osborn v. United States*, 918 F.2d 724, 729, n. 6 (8th Cir. 1990); *C.S. ex rel. Scott v. Mo. State Bd. of Educ.*, 656 F. Supp. 2d 1007, 1011 (E.D. Mo. 2009). Here, Defendant's challenge is a factual attack, and as such, the Court considers matters outside the pleadings. *Osborn,* 918 F.2d at 729-30 n. 6. The plaintiff bears the burden of demonstrating that subject matter jurisdiction exists in a factual attack. *Id.*

## Discussion

Defendant argues that the Court is without subject matter jurisdiction because Plaintiff's claims fall outside the United States' waiver of immunity. "It is well settled that the United States may not be sued without its consent*." Hinsley v. Standing Rock Child Protective Servs.,* 516 F.3d 668, 671 (8th Cir. 2008). The

FTCA is a statutory waiver of the federal government's right to sovereign immunity from suits for damages. *See* 28 U.S.C. § 1346(b)(1); *Johnson v. United States,* 534 F.3d 958, 962 (8th Cir .2008). Specifically, the FTCA allows plaintiffs to hold the United States vicariously liable for negligent, or otherwise wrongful, acts committed by federal employees in the scope of their employment. *See* 28 U.S.C. § 1346(b), 2671–2680.

Originally, the Government argued that the Court lacked subject matter jurisdiction because Matson was an independent contractor, and not an employee of the United States. This argument has been rendered moot by Plaintiff's admission that he is not suing the Government vicariously based on Matson's intentional acts, but rather Plaintiff sues on the theory that the Government is independently liable for the actions and/or inactions which allowed Matson's crimes to be committed.

Defendant also argues that Plaintiff's claims are barred by the discretionary function exception to the FTCA. The United States does not waive sovereign immunity when the "discretionary function" exception applies. *Riley v. United States*, 486 F.3d 1030, 1032 (8th Cir. 2007). The discretionary function exception provides no liability shall lie for "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency

or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

"The purpose of the discretionary function exception is to 'prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.' " *Hinsley*, 516 F.3d at 672 (quoting *United States v. Gaubert*, 499 U.S. 315, 323 (1990)). "This discretionary function exception to the FTCA 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.' " *Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 795 (8th Cir. 1998) (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)). "To the extent an alleged act falls within the discretionary function exception, a court lacks subject matter jurisdiction." *Id.* (citations omitted).

A two-part test determines when the discretionary function exception applies. *See Berkovitz v. United States,* 486 U.S. 531, 536–37 (1988). "First, the conduct at issue must be discretionary, involving an element of judgment or choice ... and not controlled by mandatory statutes or regulations[.]" *Hinsley*, 516 F.3d at 672 (internal quotation marks and citations omitted). "If the employee violated a mandatory statute, regulation, or policy, the conduct does not involve an element

of judgment or choice, and therefore, the conduct is not sheltered from liability under the discretionary function exception." *Id*. If no mandate exists, "the action is considered a product of judgment or choice and the first step is satisfied." *Id.* at 673 (citations omitted).

Under the second part of the test, the court must "determine whether the judgment or choice was based on considerations of public policy." *Id*. (citations omitted). "If the challenged action was based on a judgment grounded in social, economic, or political policy, the discretionary function exception applies." *Id.* (citations omitted). "It is the nature of the conduct and whether the conduct is susceptible to policy analysis rather than the status of the actor that governs whether the exception applies." *Metter v. United States*, 785 F.3d 1227, 1231 (8th Cir. 2015) (internal quotation marks and citations omitted). "The exception protects only governmental actions and decisions based on considerations of public policy, and there is a rebuttable presumption that the government agent's acts are grounded in policy when established governmental policy ... allows the agent to exercise discretion." Id. (internal quotation marks, brackets and citations omitted).

Specifically, § 2680(a) of the FTCA provides that sovereign immunity is *not* waived for "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, *whether or not the discretion involved be abused.* 28 U.S.C. §

2680(a) (emphasis added).  If an act falls into the discretionary function exception, sovereign immunity is not waived, and the court lacks subject matter jurisdiction over the tort claim. *Id.; Dykstra v. U .S. Bureau of Prisons,* 140 F.3d 791, 795 (8th Cir.1998)(holding that a prisoner must rebut the presumption that a prison officials' discretionary decision regarding a security matter was grounded in policy considerations).

Plaintiff counters the Government's exception argument by claiming that there is indeed a mandatory regulation requiring action on the part of government personnel at Tripler Army Medical Center.  Plaintiff argues that AR 165-1 (27 February 1998) required the government to conduct a background check on Matson.  As the government correctly argues, however, this regulation only requires a background check for individuals providing "religious education."

The government contracted with the Theatine Fathers to provide a Catholic priest to serve the needs of the Catholic members of the Tripler community.  The salient language in the contract between the Theatine Fathers and the government Provides that the priest to be sent to Tripler will provide "religious instruction." While at first glance it appears that "religious education" and "religious instruction" could equate, the evidence in the record before the Court establishes a contrary conclusion.  Had the parties intended Matson to provide education to children, the contract would have specified the number of classes to be conducted,

and the type of material to be used at those classes.  Moreover, the contract itself delineates the duties of the priest to be provided:  the priest was to provide weekday noon Mass in the hospital chapel; he was to provide a Mass on Saturday at or about 5:00 p.m., Sunday at about 7:30 a.m. and 11:00 a.m., with an additional Two Holy Day Masses.

Both Matson and Col. Fasanella, the Senior Chaplain for Tripler recognize that "religious instruction" is not the same as "religious education."  Indeed, Matson provided religious education at the request of the parents of the children; he was not obligated under Theatine Father's contract with the government to provide any type of classes for the families in the Tripler community.  Plaintiff has provided no evidence to establish that Matson was providing religious education at the behest of the government, and as such, a background check under the regulation was not required.[1]  The government has satisfied the first prong of the discretionary function test.

As to the second prong, the Court must determine if the exercise of discretion is grounded in public policy considerations.  "In deciding whether the nature of the [challenged] actions [are] 'susceptible to policy analysis,' '[t]he focus

---

[1] Although the government was not required under the regulation to perform a background check on Matson, as the government points out, it took reasonable steps to ensure Matson's background contained no felony convictions. Matson submitted to a background check in connection with his application for an ecclesiastical endorsement.  He truthfully answered at that time that he had not been convicted of a felony.  The Archdiocese for Military Services issued the ecclesiastical endorsement in accordance with the Department of Defense Directive 1304.19 (November 22, 1998).  This endorsement certified that Matson was "a priest in good standing with the Catholic Church and can validly administer the sacraments and celebrate Mass."

of the inquiry is not on the agent's subjective intent.' ... Rather, we look to whether the decision being challenged is "grounded in social, economic, or political policy.'" *Metter*, 785 F.3d at 1231-32 (8th Cir. 2015) (quoting *Gaubert*, 499 U.S. at 323, 325). The court is aware that "there is a rebuttable presumption that the government 'agent's acts are grounded in policy' '[w]hen established governmental policy ... allows [the] agent to exercise discretion." *Id.* at 1231 (quoting *Gaubert,* 499 U.S. at 323-24).

Under the second prong,

[t]he individual government employee need not have consciously considered any policy factors. The judgment or decision need only be susceptible to policy analysis, regardless of whether social, economic, political policy was ever actually taken into account, for the exception to be triggered. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion . . ., but on the nature of the actions taken and on whether they are susceptible to policy analysis.

*Hinsley,* 516 F.3d at 673 n.7.

Assuming the government knew of Matson's proclivities, (which the government vehemently disputes), the decision not to warn is susceptible to policy considerations. Tripler was in need of a Catholic priest to celebrate Mass and minister to the sick at the Hospital. Nowhere in the contract is the requirement that Matson provide Catholic education classes to the children in the community. He was approached not by government personnel to conduct CCD classes, but by the parents of the children who sought religious education for their children in

preparation of the administration of the sacraments.  Even if the government knew of Matson's issues, it could have weighed that fact against the need for a Catholic priest.  Since Matson was contracted to celebrate Mass and minister to the sick, it could be said that he was not a risk under the specific duties outlined in the contract.  The government has satisfied the second prong of the discretionary function exception to the FTCA.

## Conclusion

Here the discretionary function exception applies, sovereign immunity is not waived and the court is without jurisdiction to adjudicate the Complaint. The government's Rule 12(b)(1) motion to dismiss is granted.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss, [Doc No. 9], is **GRANTED**.

**IT IS FURTHER ORDERED** that the Plaintiff's Complaint is **DISMISSED**.

Dated this 22nd day of September, 2017.


_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE